# In the

# United States Court of Appeals

## *for the*

# Eleventh Circuit

**BRAD BUEHRLE,**

*Plaintiff-Appellant,*

v.

**CITY OF KEY WEST,**

*Defendant-Appellee.*

**Appeal from a Final Judgment in the United States District Court
for the Southern District of Florida (Key West Division)
in Civil Docket for Case No. 13-cv-10103-JEM
(Hon. Jose E. Martinez)**

## REPLY BRIEF OF PLAINTIFF-APPELLANT

**Wayne LaRue Smith**
**Brett Tyler Smith**
**The Smith Law Firm**
**a professional association**
**333 Fleming Street**
**Key West, Florida 33040**
**T: (305) 296-0029**
**F: (305) 296-9172**
**E: Court-Filings@TheSmithLawFirm.Com**

*Counsel for Plaintiff-Appellant*
*Brad Buehrle*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................... i

TABLE OF CITATIONS ........................................................................................ ii

ARGUMENT ......................................................................................................... 1

**I.** **FORCING NEW TATTOO ESTABLISHMENTS TO THE GENERAL COMMERCIAL ZONING DISTRICT IS ARBITRARY AND SUBSTANTIALLY BROADER THAN NECESSARY TO ACHIEVE THE CITY'S STATED GOALS.** .......... 3

   **A.** **The City May Not Rely on Its Own Unconstitutional Ban of Tattoo Establishments to Prevent Future Tattoo Establishments From Operating in the Historic Districts in Order to Maintain Tradition and History.** ......................................................................... 3

   **B.** **The City's Regulations Allowing Two Tattoo Establishments in the Historic Districts, but Requiring All New Tattoo Establishments Be Located in the CG District Is Arbitrary and Unreasonable, Because It Does Not Further the City's Legitimate Interests.** .................................................................................................. 5

   **C.** **The City's Regulations Do Not Provide for Ample Alternative Channels of Communication, Because the Resulting Effect of the Regulation Does Not Lessen the Effectiveness of the Protected Speech, but Instead Removes the Speaker Wholly From the Intended Audience.** ............................................................................... 8

CONCLUSION ................................................................................................... 11

CERTIFICATE OF COMPLIANCE .................................................................... 12

CERTIFICATE OF SERVICE ............................................................................ 13

# TABLE OF CITATIONS

**CASES**

Anderson v. City of Hermosa Beach, ............................................................... 11
621 F.3d 1051 (9th Cir. 2010)

Clark v. Community for Creative Non-Violence,..................................... 1, 9, 10
468 U.S. 288, 104 S. Ct. 3065 (U.S. 1984)

City of Ladue v. Gilleo, ................................................................................. 11
512 U.S. 43, 54, 114 S. Ct. 2038 (U.S. 1994)

Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta,...........8, 9
219 F.3d 1301 (11 Cir. 2000)

DA Mortg., Inc. v. City of Miami Beach,...........................................................9
486 F.3d 1254 (11 Cir. 2007)

First Vagabonds Church of God v. City of Orlando, .....................................9, 10
638 F.3d 756 (11th Cir. Fla. 2011)

Kitchen v. Herbert, ......................................................................................4
961 F. Supp. 2d 1181 (D. Utah 2013)

Ward v. Rock Against Racism,......................................................................1, 6
491 U.S. 781, 109 S. Ct. 2746 (U.S. 1989)

**CONSTITUTIONS, STATUTES, RULES AND ORDINANCES**

§§ 381.00771-381.00791, Fla. Stat. (2014) .........................................................2

Chapter 64E-28, Fla. Admin. Code (2014)...........................................................2

Key West, Fla., Code of Ordinances, Subpart B, § 122-62 (2014) .......................8

Key West, Fla., Code of Ordinances, Subpart B, §§ 122-1541...........................2, 7
through 122-1546 (2014)

Key West, Fla., Code of Ordinances, Subpart B, § 122-1543(a) (2014)................1

Key West, Fla., Code of Ordinances, Subpart B, §§ 122-1545 (2014)..................7

**ARGUMENT**

This appeal is not about a total ban on tattooing, but instead is about the City of Key West's ("City") current tattoo regulations which are substantially broader than necessary to achieve the City's three stated interests which are to prevent "the potential deterioration of a preserved historic district; an increase in the incidence of disease; and land use incompatibilities." *See* Key West, Fla., Code of Ordinances, Subpart B, § 122-1543(a) (2014); DE 20-1, p. 178.[1] Specifically, this appeal is centered on the City's unconstitutional tattoo regulations which regulate the business of tattooing in a "manner that a substantial portion of the burden on speech does not serve to advance its goals." *See* Ward v. Rock Against Racism, 491 U.S. 781, 109 S. Ct. 2746 (1989). Further, the City's regulations do not leave open alternative channels of communication; thus, failing to pass the intermediate scrutiny "reasonable time, place and manner" requirement. Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984).

In the City's Answer Brief, the City made no argument that the City's tattoo regulations, which require all new tattoo establishments be confined to the General Commercial ("CG") District, are necessary to prevent "an increase incidence of

---

[1] Per 11th Cir. R. 30-1, Appellant has filed his Appendix with this Brief and has sequentially numbered each page of the Appendix, excluding tabs. Citations to the record will be to the appropriate Docket Entry ("DE") number from the district court (which has a corresponding tab in Appellant's Appendix) along with the page number where it is found in the Appendix. (DE __, p. __).

disease," because the City and State of Florida currently have adequate health regulations in place to make tattooing as safe as going to a doctor. *See* §§ 381.00771-381.00791, Fla. Stat. (2014); Chapter 64E-28, Fla. Admin. Code (2014); Key West, Fla., Code of Ordinances §§ 122-1541 through 122-1546 (2014), DE 20-1, p. 178. In fact, since 2007, when the City allowed two tattoo establishments in the Historic Districts, there have been no health related complaints made with respect to tattooing in Key West.

In its Answer Brief, the City focused the majority of its argument on the City's legitimate interest in that the "the preservation of the historic district constituted a significant government interest because it was done to promote a major industry, tourism." Answer Brief, p. 17. Buehrle agrees that the promotion of a major industry is a legitimate governmental interest, and that tourism is the City's primary industry. However, Buehrle implores this Court to examine the factually baseless reasoning for why the regulations are necessary to promote tourism, and in doing so hold that the City's tattoo regulations are substantially broader than necessary to achieve its goal.

**I.** **FORCING NEW TATTOO ESTABLISHMENTS TO THE GENERAL COMMERCIAL ZONING DISTRICT IS ARBITRARY AND SUBSTANTIALLY BROADER THAN NECESSARY TO ACHIEVE THE CITY'S STATED GOALS.**

**A. <u>The City May Not Rely on Its Own Unconstitutional Ban of Tattoo Establishments to Prevent Future Tattoo Establishments From Operating in the Historic Districts in Order to Maintain Tradition and History</u>.**

The foundation for the legitimate interest that underlies the City's regulations is not founded in fact or evidence, but instead is comprised of mere opinions, unsubstantiated fears and conjecture.

The City justifies its tattoo regulations on the "basis of protecting the character of the history district", which in turn will promote tourism. Answer Brief, p. 19. The source of the City's "undisputed record evidence" which it relies on in its Answer Brief is the speculative opinion of the City's Director of Planning. Answer Brief, p. 17 (citing DE 28-1 at ¶¶ 17, 19). However, that unsupported opinion is completely undermined by the City's Senior Planner II, Brendan Cunningham, who stated during his deposition that he was not aware of any land use incompatibilities directly related to allowing new tattoo establishments in the Historic Districts and that he was not aware of any deterioration of the historic district as a result of the inclusion of the two tattoo establishments that have been operating in the Historic Districts since 2007. DE 17, p. 61. In other words, the

existence of two tattoo establishments in the Historic District for more than five years has had no negative impact on the character of the Historic Districts.

Kitchen v. Herbert, 961 F. Supp. 2d 1181, 1187 (D. Utah 2013) stands for the proposition that the government may not deny a fundamental right on the basis of "tradition and history". Id. at 1203. The City's attempts to distinguish itself from Kitchen on the basis that its interest is the promotion of a major industry, tourism, but fails to do so as the City later reiterates the same argument that "[i]f the goal of the regulations is maintaining the character and fabric of the Historic Districts (to promote tourism) which traditionally did not contain tattoo establishments, then new limiting tattoo establishments to the General Commercial Districts is the least restrictive means of accomplishing this goal." Answer Brief, p. 18.

Although not in the Record, it can be inferred that tattoo establishments were located in the Historic Districts prior to the total ban that was enacted in the mid-1960s. The Historic Districts are adjacent to the seaports and naval bases. The Navy requested the ban from the City. *See* DE 20-16, p. 290. It is logical to conclude that the Navy made the request in order to eliminate tattoo establishments from the Historic Districts. However, the City nonetheless argues that due to the absence of tattoo establishments for forty years based on an unconstitutional ban imposed by the City, it can continue to prevent tattoo establishments from

operating in the Historic Districts in order to maintain the Historic Districts' "character and fabric", or put another way, "tradition and history".

The City's current "character and fabric" of the Historic Districts was artificially created by the City as a direct result of its own unconstitutional ban. The resulting effect is an animus-driven regulation based on the perception of a few that tattoo establishments will harm the City's tourism industry.

**B. <u>The City's Regulations Allowing Two Tattoo Establishments in the Historic Districts, but Requiring All New Tattoo Establishments Be Located in the CG District Is Arbitrary and Unreasonable, Because It Does Not Further the City's Legitimate Interests.</u>**

The City inaccurately asserts that Buehrle does not "address" the appropriateness of the City's relegation of all new tattoo establishments to the CG District "given the limited amount of space which exists on the island." Answer Brief, p. 19. Contrary to the City's assertion, Buehrle does address the arbitrariness of the City's regulations "restricting tattoo establishments to the two existing ones along to [sic] Duval Street and to the General Commercial District along Roosevelt Boulevard" in his Opening Brief, and demonstrated that the restrictions were substantially broader than necessary to achieve the City's legitimate interests. Answer Brief, p. 19; *See* Opening Brief, p. 19.

The City's restrictions requiring all new tattoo establishments to operate in the CG District, while allowing two tattoo establishments in the Historic Districts, is arbitrary and does not further the City's stated interests. Specifically, the two

"grand fathered-in tattoo establishments" in the Historic District are contrary to the City's stated interests. Answer Brief, p. 19. In the City's Answer Brief the City refers to the two "grand fathered-in tattoo establishments"; however, the two tattoo establishments are only considered "grand fathered-in" as a result of a settlement agreement entered into to resolve prior First Amendment litigation. Answer Brief, p. 19; *See* Opening Brief, p. 7; DE 20-4, p. 207. The City's motivations for allowing the two "grand fathered-in" establishments was solely to resolve litigation in the most expeditious manner possible, and the number of establishments permitted in the Historic Districts was arbitrary and directly related to the number of litigants in the previous suit with the City, over the identical issue as is presented here. Therefore, the allowance of two tattoo establishments in the Historic Districts while requiring new establishments to be located in the CG District is not appropriate, but arbitrary.

To further respond to the City's assertion that Buehrle does not address the appropriateness of the regulations, the case law states that a "regulation of the time, place or manner of speech…must be narrowly tailored to serve the government's legitimate content-neutral interests, [but] it need not be the least restrictive or least intrusive means of doing so." Ward v. Rock Against Racism, 491 U.S. 781, 798, 109 S. Ct. 2746, 2757 (1989). The least-intrusive means requirement is reserved for content-based restrictions that require review at the strict scrutiny level. Id.

Buehrle acknowledges that the least-intrusive means requirement does not apply, but aside from arbitrarily consigning all tattoo establishments to the CG District, the City's current regulations are sufficient to achieve all of its legitimate interests. *See generally* Key West, Fla., Code of Ordinances, Subpart B, §§ 122-1541 through 122-1546 (2014).

The City currently has sufficient health restrictions that, if enforced properly, would prevent any health related incidents. Id. This is supported by the fact that there have been no reported health cases resulting from the two tattoo establishments in the Historic District since opening in 2007. Second, the City currently has in place separation requirements that prevent tattoo establishment from being within 500 feet of any other such establishment, house of worship, school, child care center, library, or public park. Key West, Fla., Code of Ordinances, Subpart B, §§ 122-1545 (2014), DE 20-1, p. 180. In the event that tattoo establishments were a conditional use in every commercial zoning district that is zoned for retail and medical offices, the separation requirements would naturally limit the proliferation of tattoo establishments. The total distance between the beginning of the Historic Residential Commercial Core 1 – Duval Street Gulfside District (HRCC-1) and the end of the Historic Residential Commercial Core 3 – Duval Street Oceanside District (HRCC-3) (the retail and commercial portion of Duval Street) is one mile; thus, once the inclusion of the

7

other prohibited uses for the separation requirements are taken into consideration the current regulations would not allow for a significant increase in tattoo establishments in the Historic Districts. *See* DE 20-16, p. 290. Further, the City's Planning Board could determine on a case by case basis whether any supposed land use incompatibilities exist prior to granting a business tax receipt. Key West, Fla., Code of Ordinances, Subpart B, § 122-62 (2014).

C. **<u>The City's Regulations Do Not Provide for Ample Alternative Channels of Communication, Because the Resulting Effect of the Regulation Does Not Lessen the Effectiveness of the Protected Speech, but Instead Removes the Speaker Wholly From the Intended Audience</u>.**

The City's regulations do not provide alternative channels of communication because 1) there is no guarantee that Buehrle could work for one of the two tattoo establishments in the Historic District, and 2) if tattoo establishments were an incompatible land use anywhere in the City, it would be in the CG District because that zoning district is devoid of any art related establishments. *See* DE 20-18, p. 313. By requiring new tattoo establishments to be located in the CG District the City is not lessening the effectiveness of the speaker's message, but completely removing the speaker from the intended audience.

The City in its Answer Brief relies on several cases which are distinguishable to the current matter before the Court. Answer Brief, p. 19-23. First, the City cites <u>Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta</u>, 219 F.3d 1301 (11 Cir. 2000). In <u>Coalition for the Abolition of Marijuana</u>

Prohibition, a national coordinator was denied a festival permit to conduct an event that advocated marijuana law changes; however, the organization was allowed to carry out the event in the park, but without "[l]ighting, stage covers, electricity, barricades, or any of the other benefits conferred by an outdoor festival permit." Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1320. This Court held that the City of Atlanta's festival ordinance was constitutional because the Coalition for the Abolition of Marijuana Prohibition could use the same park for its event, albeit in a "less effective" way. Id. at 1319.

The second case cited by the City with respect to alternative channels is DA Mortg., Inc. v. City of Miami Beach, 486 F.3d 1254 (11 Cir. 2007), where this court was tasked with determining whether a sound ordinance was constitutional. Id. In DA Mortg., Inc., the City of Miami Beach imposed a sound regulation governing the level of volume permitted, but nonetheless allowed for the use of reproduced sounds to continue in the same location. Id. at 1268. In DA Mortg., Inc., alternative channels existed because the sound regulation did not require the sound to be reproduced at a different location, but instead at a lower level of volume. Id. at 1268.

Lastly, the City relies heavily on First Vagabonds Church of God v. City of Orlando, 638 F.3d 756 (11th Cir. Fla. 2011), which in turn relied on Clark v. Community for Creative Non-Violence. In both Clark and First Vagabonds

9

Church of God, the issues revolved around demonstrations in public parks that amounted to expressive conduct. *See generally* First Vagabonds Church of God v. City of Orlando, 638 F.3d 756; Clark v. Community for Creative Non-Violence, 468 U.S. 288. In First Vagabonds Church of God v. City of Orlando, the challenged ordinance allowed for any person or entity to "obtain two permits a year for each of the 42 parks in the Greater Downtown Parks District, which allows for a total of 84 group feedings a year at parks within a two-mile radius of the City Hall." First Vagabonds Church of God v. City of Orlando, 638 F.3d at 761. However, the ordinance was challenged because First Vagabonds Church of God believed "that it has a right under the *First Amendment* to conduct feedings of large groups in any park as often as it likes." Id. at 758. Nonetheless, in First Vagabonds Church of God, the complainant was allowed to convey its message in the location of its choosing, but only twice a year at any given park.

All three cases cited by the City are distinguishable because in all three situations the complainant either was allowed to use the desired location or play the same reproduced sound. In the three cited cases, the complainants had alternative channels, though the channels available were less effective.

In the case at bar the City allows for no such option. Buehrle has no guarantee that he could become employed at one of the two tattoo establishments in the Historic Districts, or that even if employed he would be able to practice his

10

art freely with unfettered control over his artistic expressions. Additionally, the record makes clear that the CG District is devoid of any artistic establishment. *See* DE 20-18, p. 313. Contrary to what the City argues, consigning new tattoo establishments to the CG District is not about Buehrle's "economic concerns" but is specifically centered on the fact that the CG District is not an alternative channel of communication. Answer Brief, p. 19. Unlike the cases cited by the City, the current matter is more akin to <u>Anderson v. City of Hermosa Beach</u>, 621 F. 3d 1051 (9th Cir. 2010) as the City's regulations are not "less effective than [Buehrle] would prefer" but instead "completely foreclosed a venerable means of communication that is both unique and important." <u>Id.</u> at 1066 (citing <u>City of Ladue v. Gilleo</u>, 512 U.S. 43, 54, 114 S. Ct. 2038 (U.S. 1994).

## <u>CONCLUSION</u>

The City's regulations on tattoo establishments are substantially broader than necessary to achieve the City's interests, and are not narrowly tailored. The City's regulations were created arbitrarily and a substantial portion of the burden on speech does not serve to advance its goals. For the reasons set forth above and in the Opening Brief, Appellant Brad Buehrle respectfully requests that this Court reverse the Order on Motions for Summary Judgment [DE 56] and Final Judgment [60] of the district court, and the case should be remanded to the district court.

By: /s/ <u>Brett Tyler Smith</u>
Attorney for Appellant, Brad Buehrle

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 2(a)(7)(B) because:

1. This reply brief contains 2,743 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6).

2. The brief was prepared in a proportionally spaced typeface using Microsoft Word 2010, Times New Roman 14 point.

By: /s/Brett Tyler Smith
Attorney for Appellant, Brad Buehrle

## CERTIFICATE OF SERVICE

I, Brett Tyler Smith, do hereby certify that on the 8th day of June, 2015, a copy of the foregoing Brief of Plaintiff-Appellant was served on the following by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing:

***Counsel for Appellee City of Key West***
(service by CM/ECF)
Michael T. Burke, Esq. (338771)
Hudson C. Gill, Esq. (15274)
Johnson, Anselmo, Murdoch,
Burke, Piper & Hockman, P.A.
2455 East Sunrise Blvd., Suite 1000
Fort Lauderdale, Florida  33304
T: (954) 463-0100
F: (954) 463-2444
E: Burke@jambg.com
E: HGill@jambg.com

/s/ Brett Tyler Smith
WAYNE LaRUE SMITH
Florida Bar No. 031410
BRETT TYLER SMITH
Florida Bar No. 85412
THE SMITH LAW FIRM,
a professional association
Attorneys for Appellant
Brad Buehrle
333 Fleming Street
Key West, Florida 33040
T: (305) 296-0029
F: (305) 296-9172
E: Court-Filings@TheSmithLawFirm.Com
